IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL ULLMAN, | ) | CASE NO.  1:20-CV-00644-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

Plaintiff, Michael Ullman ("Plaintiff" or "Ullman") challenges the final decision of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying his application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act,42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is VACATED AND REMANDED FOR FURTHER CONSIDERATION CONSISTENT WITH THIS OPINION.

## I.     PROCEDURAL HISTORY

In November 2016, Ullman filed an application for POD and DIB alleging a disability onset date of November 16, 2016 and claiming he was disabled due to post-traumatic stress disorder, depression, audible and visual hallucinations, nightmares, inability to sleep effectively, arthritis of the right knee, alcoholism and substance abuse, social withdrawal and lack of expression, and high risk behavior.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

(Transcript ("Tr.") at 46, 175-76.)  The application was denied initially and upon reconsideration, and Ullman requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 46.)

On October 16, 2018, an ALJ held a hearing, during which Ullman, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On March 12, 2019, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 46-60.)  The ALJ' s decision became final on January 29, 2020, when the Appeals Council declined further review.  (*Id.* at 1-7.)

On March 26, 2020, Ullman filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 15, 17.) Ullman asserts the following assignments of error:

(1)  The ALJ erred when it [sic] found that in the absence of polysubstance use, the claimant's mental impairments cause only mild to moderate limitations.

(2)  The ALJ violated the treating physician rule.

(Doc. No. 15 at 13, 16.)

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

Ullman was born in July 1970 and was 48 years-old at the time of his administrative hearing (Tr. 53, 138), making him a "younger" person under Social Security regulations.  *See* 20 C.F.R. § 404.1563(c). He has at least a high school education and is able to communicate in English.  (Tr. 53.)  He has past relevant work as a computer system hardware analyst.  (*Id.*)

### B.     Relevant Medical Evidence[2]

On March 4, 2015, Ullman saw psychiatrist Dr. David Streem for routine medication management.

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs. Furthermore, as Ullman does not challenge the ALJ's physical RFC findings, the discussion of the evidence focuses on Ullman's mental impairments.

(*Id.* at 441.)  Ullman reported having stopped taking his Zoloft three weeks before because he thought maybe he did not need it anymore.  (*Id.*)  However, when his symptoms returned, Ullman realized he did need it and restarted Zoloft three days before.  (*Id.*)  Ullman also admitted having drank the day before his appointment.  (*Id.*)  Ullman complained of anxiety and agitation, as well as guilt and shame about his relapse.  (*Id.*)  Ullman was concerned about Zoloft taking another two to three weeks to kick in like it had when he first began taking it.  (*Id.*)  Dr. Streem rated Ullman's interval progress as "[s]lightly improved." (*Id.*)  On examination, Dr. Streem found Ullman well groomed, with clear, distinct speech, normal language, intact associations, a logical, coherent, and rational thought process, and an appropriate and adequate fund of knowledge.  (*Id.* at 441-42.)  Dr. Streem determined Ullman was oriented times four, his memory was intact, his concentration was normal, his mood was anxious, and his affect was flat.  (*Id.* at 442.)  Dr. Streem continued Ullman's Zoloft and Ullman agreed to try a short-term Neurontin trial.  (*Id.*) Dr. Streem also gave Ullman the contact information for Dr. Faust for individual therapy for his PTSD. (*Id.*)  Ullman's diagnoses included substance-related disorders, alcohol use disorders, dependence, anxiety disorder, and chronic PTSD.  (*Id.*)

On April 6, 2015, Ullman saw Susan Daum, CS-ANP, for an individual psychotherapy assessment. (*Id.* at 453.)  Ullman told Daum he had been released from Glenbeigh Rock Creek after a month of treatment.  (*Id.*)  He was to start an Intensive Outpatient Program and then see Dr. Streem for Aftercare at Lutheran.  (*Id.*)  Ullman reported unresolved PTSD issues, nightmares, and hypervigilance.  (*Id.*)  Ullman told Daum he would be seeing Dr. Faust one on one for treatment.  (*Id.*)  Ullman's diagnoses included alcohol dependence in early full remission, mild cannabis abuse in early remission, mild cocaine use in early remission, and PTSD.  (*Id.* at 455.)

On April 10, 2015, Ullman saw Dr. Streem for routine medication management.  (*Id.* at 465.) Ullman reported doing well since being discharged from Glenbeigh, although he wanted to get started

with individual therapy for his PTSD as soon as possible.  (*Id.*)  Dr. Streem rated Ullman's interval progress as "[s]lightly improved."  (*Id.*)  On examination, Dr. Streem found Ullman well groomed, with clear, distinct speech, normal language, intact associations, a logical, coherent, and rational thought process, and an appropriate and adequate fund of knowledge.  (*Id.* at 465-66.)  Dr. Streem determined Ullman was oriented times four, his memory was intact, his concentration was normal, his mood was anxious, and his affect was flat.  (*Id.* at 466.)  Dr. Streem noted he had reviewed Daum's note and agreed with her assessment and plan.  (*Id.*)  Dr. Streem wanted to see Ullman "start therapy with a therapist trained in a generally accepted PTSD therapy as soon as possible along with IOP."  (*Id.*)

On May 12, 2015, Ullman saw Dr. Streem for routine medication management.  (*Id.* at 475.) Ullman reported somewhat improved sleep and fewer hallucinations.  (*Id.*)  Dr. Streem rated Ullman's interval progress as "[s]lightly improved."  (*Id.*)  On examination, Dr. Streem found Ullman well groomed, with soft, monotone speech, normal language, intact associations, a logical, coherent, and rational thought process, and an appropriate and adequate fund of knowledge.  (*Id.* at 475-76.)  Dr. Streem determined Ullman was oriented times four, his memory was intact, his concentration was improving, his mood was anxious and depressed, and his affect was flat.  (*Id.* at 476.)  Ullman reported no suicidal or homicidal ideation.  (*Id.*)  Dr. Streem increased Ullman's Seroquel and Ullman was to work on completing his and his wife's taxes.  (*Id.*)  Dr. Streem opined, "This is a typical task of Michael's in their relationship and if he can make progress on this task over the rest of this week it'll suggest he can function at work, perhaps at half-time."  (*Id.*)

On May 15, 2015, Ullman saw Dr. Streem for routine medication management.  (*Id.* at 480.) Ullman reported doing better and had nearly completed their taxes and other paperwork he needed to do. (*Id.*)  Ullman told Dr. Streem he was sleeping better and had not had any hallucinations in the past twenty-four hours.  (*Id.*)  However, when out running errands, Ullman stopped at the casino and did not tell his

wife until afterwards.  (*Id.*)  Ullman and his wife agreed Ullman should try returning to work.  (*Id.*)  On examination, Dr. Streem found Ullman well groomed, with soft, monotone speech, normal language, intact associations, a logical, coherent, and rational thought process, and an appropriate and adequate fund of knowledge.  (*Id.* at 481.)  Dr. Streem determined Ullman was oriented times four, his memory was intact, his concentration was impaired, his mood was anxious and depressed, and his affect was flat.  (*Id.*)  Ullman reported no suicidal or homicidal ideation.  (*Id.*)  Dr. Streem continued Ullman's current medications and agreed Ullman could return to work in the afternoons only starting the next week.  (*Id.*)  If Ullman was able to wake up on time every morning as if he was going to work, Dr. Streem would release Ullman to return to work full-time.  (*Id.*)

On August 19, 2015, Ullman saw Moshen Vazirian, M.D., reporting he was in a crisis.  (*Id.* at 500.)  Ullman told Dr. Vazirian he had been five months sober until last night, when he drank three to four beers and smoked marijuana.  (*Id.*)  Ullman reported feeling trapped and constant craving.  (*Id.*)  Dr. Vazirian rated Ullman's interval progress as worse.  (*Id.*)  On examination, Dr. Vazirian found Ullman well groomed, with soft, monotone speech, normal language, intact associations, a logical, coherent, and rational thought process, and an appropriate and adequate fund of knowledge.  (*Id.* at 501.)  Dr. Vazirian determined Ullman was oriented times four, his memory was intact, his concentration was impaired, his mood was anxious and depressed, and his affect was flat.  (*Id.*)  Ullman reported no suicidal or homicidal ideation.  (*Id.*)  Dr. Vazirian recommended increasing Ullman's Zoloft but deferred to Dr. Streem, who would see Ullman the next day, recommended Ullman follow up with his outpatient therapist, and recommended Ullman speak to his sponsor and not go out alone.  (*Id.*)  Dr. Vazirian noted, "This level of care is not enough.  I will explore if he could go to evening IOP or another type of outpatient program." (*Id.*)

On August 22, 2015, Ullman was admitted to Lutheran Hospital after presenting to the emergency

room complaining of worsening depression with suicidal ideation and requesting detoxification.  (*Id.* at 668.)  While Ullman denied a specific suicidal plan and told providers his suicidal intent was questionable at the time, he reported his depression was worse than ever.  (*Id.*)  Ullman also reported relapsing on alcohol and crack cocaine three weeks before and using intermittently over the past three weeks with two to three-day bingeing periods.  (*Id.*)  Ullman told treatment providers over the past three days, he had drunk 20 beers a day and smoked larger amounts of crack cocaine than normal.  (*Id.*)  Ullman complained of low mood, poor concentration, decreased energy, sleep problems, hopeless and helpless thoughts, lack of interest, and suicidal ideation without plan.  (*Id.*)  In addition, Ullman reported nightmares, hypervigilance, flashbacks, and avoidance that had "only been mildly receptive to the Zoloft so far."  (*Id.*)

During his hospital stay, Ullman saw treatment providers daily and reported improvements in his mood and anxiety, although he was still groggy with his medication.  (*Id.* at 669.)  On August 26, 2015, Ullman denied suicidal intent and contacted for his safety.  (*Id.*)  On examination that day, treatment providers found Ullman well groomed, he behaved appropriately during the session, was oriented times four, and had normal speech and language, an appropriate mood/affect, logical and coherent thought, fair insight, limited judgment, and intact memory/cognition.  (*Id.*)  Treatment providers determined it was appropriate to discharge Ullman home and reduced his Seroquel dose.  (*Id.*)

On October 22, 2015, Ullman saw Dr. Streem for routine medication management.  (*Id.* at 539.)  Ullman had completed his resume, which Dr. Streem noted was "organized and clearly written by someone who is an expert in his field" and who could "be counted on to deliver when he is needed."  (*Id.*)  Dr. Streem rated Ullman's interval progress as "[s]lightly improved."  (*Id.*)  On examination, Dr. Streem found Ullman well groomed, with soft, monotone speech, normal language, intact associations, a logical, coherent, and rational thought process, and an appropriate and adequate fund of knowledge.  (*Id.* at 539-40.)  Dr. Streem determined Ullman was oriented times four, his memory was intact, his concentration

6

was improved, his mood was anxious and depressed, and his affect was flat.  (*Id.* at 540.)  Ullman reported no suicidal or homicidal ideation.  (*Id.*)

On July 12, 2016, Ullman was admitted to Lutheran Hospital for depression and suicidal ideation without a plan.  (*Id.* at 674.)  The next day, Mary Harrison, CNS, examined Ullman and Ullman told her he was not suicidal and wanted to go home.  (*Id.*)  Ullman stated he was "very stressed yesterday morning after relapsing on alcohol and cocaine the day before," and had his wife drive him to the emergency room after he began fearing he would hurt himself.  (*Id.*)  Since then, he had slept well and had a good conversation with his wife.  (*Id.*)  On examination, Harrison found Ullman "dramatic and immature," as well as "very polarized."  (*Id.*)  Ullman demonstrated appropriate mood/affect, coherent thought, fair insight, fair judgment, and intact memory/cognition.  (*Id.* at 676.)  Harrison noted Ullman had been sober for almost a year before relapsing the month before.  (*Id.* at 675.)  Harrison discharged Ullman that day. (*Id.* at 673.)

On July 15, 2016, Ullman saw Dr. Streem for routine medication management.  (*Id.* at 594.) Ullman told Dr. Streem he had drank in January but had not had a drink since then.  (*Id.*)  Dr. Streem noted Ullman had been "[r]ecently hospitalized when confronted with his financial problems and gambling losses."  (*Id.*)  Dr. Streem rated Ullman's interval progress as "[s]lightly improved."  (*Id.* at 595.)  On examination, Dr. Streem found Ullman well groomed, with soft, monotone speech, normal language, intact associations, a logical, coherent, and rational thought process, and an appropriate and adequate fund of knowledge.  (*Id.*)  Dr. Streem determined Ullman was oriented times four, his memory was intact, his concentration was improved, his mood was anxious and depressed, and his affect was flat. (*Id.*)  Ullman reported no suicidal or homicidal ideation.  (*Id.*)  Ullman agreed to a trial of Prozac.  (*Id.*)

On October 7, 2016, Ullman saw Dr. Streem for routine medication management.  (*Id.* at 618.) Ullman reported tolerating Prozac well and having had a good past few days, although he was more

depressed that day and was not sure why.  (*Id.*)  Ullman thought it might be because he had upcoming deadlines with work, although his relationship with his supervisor was better.  (*Id.*)  Dr. Streem rated Ullman's interval progress as "[s]lightly improved."  (*Id.* at 619.)  On examination, Dr. Streem found Ullman well groomed, with soft, monotone speech, normal language, intact associations, a logical, coherent, and rational thought process, and an appropriate and adequate fund of knowledge.  (*Id.*)  Dr. Streem determined Ullman was oriented times four, his memory was intact, his concentration was improved, his mood was anxious and depressed, and his affect was flat.  (*Id.*)  Ullman reported no suicidal or homicidal ideation.  (*Id.*)  Dr. Streem ordered Ullman to continue Prozac and follow up with Dr. Faust every other week.  (*Id.*)

On November 17, 2016, Ullman saw Dr. Streem for routine medication management.  (*Id.* at 628.)  Ullman told Dr. Streem he had spoken with Dr. Faust and would be seeing him that afternoon.  (*Id.*)  Ullman reported having been fired that week and he had submitted a few applications for other positions.  (*Id.*)  Ullman told Dr. Streem he had taken a few doses of Seroquel for his flashbacks and hallucinations and it helped.  (*Id.*)  Dr. Streem determined Ullman was "functioning better than [he] would have thought at this point."  (*Id.*)  Dr. Streem rated Ullman's interval progress as "[s]lightly improved."  (*Id.* at 629.)  On examination, Dr. Streem found Ullman well groomed, with soft, monotone speech, normal language, intact associations, a logical, coherent, and rational thought process, and an appropriate and adequate fund of knowledge.  (*Id.*)  Dr. Streem determined Ullman was oriented times four, his memory was intact, his concentration was improved, his mood was anxious and depressed, and his affect was flat.  (*Id.*)  Ullman reported no suicidal or homicidal ideation.  (*Id.*)

On March 8, 2017, Ullman's psychologist, Dr. Faust, wrote a letter in support of Ullman's application for disability benefits.  (*Id.* at 693-94.)  Ullman's diagnoses included recurrent and severe

8

major depressive disorder, alcohol abuse, and alcohol dependence in early remission.  (*Id.* at 694.)  Dr. Faust opined:

> Mr. Ullman presents to me as a very motivated and insightful individual who is severely compromised at this time.  I do believe that he is currently heavily compromised on attention, concentration, memory processes, and ability to persist especially in any occupation which requires social interaction, adaptation, and a regular employment schedule given dramatic loss of frustration tolerance, increased anxiety and agitation, and sleep disruption documented above.  It is my professional opinion that he is not capable of gainful employment at this time and I'm hopeful that with continued medication adjustment and treatment contingent [sic] continued sobriety, that he should be re-evaluated within six months.

(*Id.* at 693.)

On March 11, 2017, Ullman was admitted to Cleveland Clinic's Glenbeigh facility for alcohol detoxification and treatment for his alcohol dependency.  (*Id.* at 696.)  On examination that day, psychiatrist Dr. Brahmaiah Tandra found Ullman's speech, appearance, and general functioning unremarkable, his mood sad, his affect consistent with his mood, his thought process and thought content unremarkable, visual and auditory hallucinations, his intellectual functioning unremarkable, his insight poor, his judgment limited, and no suicidal or homicidal ideation.  (*Id.* at 698-99.)  Dr. Tandra noted Ullman did not want to take antipsychotics for his psychotic symptoms at that time.  (*Id.* at 699.)  Ullman's diagnoses included alcohol use disorder, severe, dependence, cocaine use disorder, moderate, dependence, chronic PTSD, major depressive disorder, recurrent, severe with psychotic features, nightmares, hallucinations, and social anxiety disorder.  (*Id.*)

During a self-harm assessment that day, Ullman denied feeling like killing or harming himself.  (*Id.* at 702.)  Ullman reported he last thought of suicide one week ago with the start of a plan to overdose, although Ullman said he would not be able to go through with it.  (*Id.*)

On March 12, 2017, Susan Ciufo, RN, conducted a brief mental status examination.  (*Id.* at 703.)  Nurse Ciufo found Ullman had a somewhat appropriate appearance, somewhat appropriate behavior,

speech, and mood/affect, intact thought process, average intelligence, intact memory, and somewhat impaired insight and judgment.  (*Id.*)  Ullman denied suicidal and homicidal ideation and was oriented times three.  (*Id.*)

On November 15, 2017, Ullman saw Dr. Michael Primo for a psychiatric evaluation as a result of a relapse.  (*Id.* at 379.)  Dr. Primo noted Ullman had been in Glenbeigh for thirty days in March, and after leaving Glenbeigh spent three weeks at a halfway house.  (*Id.*)  Ullman told Dr. Primo he "was unable to bare [sic] the closeness of being with 3 other men in a room – developed a dissociative episode."  (*Id.*)  Ullman also reported auditory hallucinations the week before.  (*Id.*)  On examination, Dr. Primo found Ullman had a dysphoric and anxious mood, constricted affect, circumstantial thought process, fair insight, and fair to poor judgment.  (*Id.*)  Dr. Primo noted Ullman was "reluctant to begin anti-psychotic—likely due to fears of lowering guard."  (*Id.* at 380.)  That same day, Ullman was again admitted to Glenbeigh for treatment.  (*Id.* at 919.)

On December 12, 2017, Gary Brooks, MA, LIDC-CS, noted he had received a letter from Glenbeigh regarding Ullman's treatment there.  (*Id.* at 921.)  All indicators were good, and Ullman continued to work hard and do well in his treatment.  (*Id.*)

On January 28, 2018, Dr. Faust completed a Medical Source Statement – Mental Capacity.  (*Id.* at 915-16.)  Dr. Faust opined Ullman was markedly impaired in his abilities to: handle conflicts with others; keep social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness; complete tasks in a timely manner; ignore or avoid distractions while working; sustain an ordinary routine and regular attendance at work; manage his psychologically based symptoms; and work a full workday without need additional work breaks.  (*Id.*)  Dr. Faust identified the cause of these limitations as Ullman's PTSD.  (*Id.* at 916.)

Ullman continued to receive mental health treatment at the Cleveland Clinic throughout 2018.  On

10

February 14, 2018, Ullman saw Dr. Streem for routine medication management.  (*Id.* at 937.)  Dr. Streem noted Ullman had just graduated from a sixty-day sober living program and had moved to Cornerstone, another sober living facility.  (*Id.*)  Ullman had been sober for three months.  (*Id.*)  Dr. Streem rated Ullman's interval progress as "[s]lightly improved."  (*Id.*)  On examination, Dr. Streem found Ullman well groomed, with soft, monotone speech, normal language, intact associations, logical, coherent, and rational thought process, and an appropriate and adequate fund of knowledge.  (*Id.* at 938.)  Dr. Streem determined Ullman was oriented times four, his memory was intact, his concentration was stable, his mood was anxious and depressed, and his affect was flat.  (*Id.*)  Ullman reported no suicidal or homicidal ideation. (*Id.*)

On March 6, 2018, Darlan Scott, LICDC, noted they had received a report from Glenbeigh regarding Ullman's progress in their IOP.  (*Id.* at 946.)  All indicators were good, and Ullman was progressing "very well" at the time and was "mentally in a good place while in his recovery process." (*Id.*)  Ullman attended meetings weekly and his discharge was still pending at the time.  (*Id.*)

On July 5, 2018, Ullman saw Dr. Streem for routine medication management.  (*Id.* at 955.)  Dr. Streem agreed with Dr. Vazirian's recommendation for MDIOP, and Ullman was to schedule.  (*Id.*) Ullman reported having stopped taking his perphenazine because he felt like it was causing "'malaise,'" but he continued to feel that way even after stopping the medication.  (*Id.*)  Ullman told Dr. Streem he was tearful every day, sometimes for hours.  (*Id.*)  Thinking of his children helped give him reason to live. (*Id.*)  Ullman reported his trauma-related nightmares had gotten worse in the last week.  (*Id.*)  Dr. Streem rated Ullman's interval progress as "[s]lightly improved."  (*Id.* at 956.)  On examination, Dr. Streem found Ullman well groomed, with soft, monotone speech, normal language, intact associations, a logical, coherent, and rational thought process, and an appropriate and adequate fund of knowledge.  (*Id.*)  Dr. Streem determined Ullman was oriented times four, his memory was intact, his concentration was stable,

11

his mood was anxious and depressed, and his affect was flat.  (*Id.*)  Ullman reported some thoughts of suicide but none in the past two weeks.  (*Id.*)  Dr. Streem ordered Ullman to restart his perphenazine and recommended the MDIOP.  (*Id.*)

On July 10, 2018, Ullman underwent a diagnostic assessment for Marymount Medical Center's Intensive Outpatient Program.  (*Id.* at 1209.)  On examination, Thomas Supan, LPCC, found Ullman's suicide risk low.  (*Id.*)  Ullman reported constant rumination about past events at bedtime, hearing voices at times, crying for hours at a time, poor appetite, concentration, focus, and energy, suicidal thoughts that he would not act on, excessive day time sleeping because his sleep at night is poor, flashbacks, and nightmares.  (*Id.* at 1209-10.)  Supan noted, "His demeanor is unusual-he appears with flat affect and speaks in a monotone.  He comments that he is eccentric."  (*Id.* at 1210.)  On examination, Supan found Ullman demonstrated eccentric, "[p]sychomotorly slowed" behavior.  (*Id.* at 1212.)  Supan determined Ullman's mood was depressed and his affect was blunted and flat, but his insight and judgment were fair. (*Id.* at 1212-13.)  Ullman was oriented times four, was somewhat tearful, and talked in a slow, monotone voice.  (*Id.*)

On July 23, 2018, Ullman went to the emergency room with suicidal ideation.  (*Id.* at 1227.) Ullman reported having thoughts of jumping off his balcony or stabbing himself with a knife.  (*Id.* at 1244.)  Ullman told Diana Lorenzo, M.D., that his depression was a 10/10, he could not contract for his safety, and he had no support at home.  (*Id.* at 1216.)  Ullman told Dr. Lorenzo he was compliant with his medications, but he did not feel any improvement.  (*Id.*)  Ullman also complained of poor sleep and poor appetite, telling Dr. Lorenzo he had lost 50 pounds since January.  (*Id.*)  On examination, Dr. Lorenzo found Ullman had clear and distinct speech, normal language, intact associations, a logical, coherent, and rational thought process, and an appropriate and adequate fund of knowledge.  (*Id.* at 1217.)  Dr. Lorenzo determined Ullman was oriented times four, his memory was intact, his concentration was normal, his

mood was depressed, and his affect was restricted.  (*Id.*)  Dr. Lorenzo decided to "pink slip" Ullman and admit him to inpatient psychiatry.  (*Id.*)  Ullman remained in the psychiatry ward at Lutheran Hospital from July 23, 2018 to July 30, 2018.  (*Id.* at 1246.)

On August 1, 2018, Dr. Faust completed a Medical Source Statement – Mental Capacity.  (*Id.* at 974-75.)  Dr. Faust opined Ullman was markedly impaired in his abilities to: understand and learn terms, instructions, or procedures; recognize and correct mistakes; use reason and judgment to make work-related decisions; handle conflicts with others; understand and respond to social cues; respond to requests, suggestions, criticism, correction, and challenges; work at an appropriate and consistent pace; complete tasks in a timely manner; work close to or with others without distracting them; respond to demands; adapt to changes; and set realistic goals.  (*Id.*)  Dr. Faust further opined Ullman had "extreme" limitations in his abilities to: sequence multi-step activities; keep social interactions free of excessive irritability, sensitivity, argumentativeness, or suspicion; ignore or avoid distractions while working; sustain an ordinary routine and regular attendance at work; work a full day without needing more than the allotted number or length of rest periods during the day; and manage his psychologically based symptoms.  (*Id.*)  Dr. Faust concluded with the opinion that Ullman's mental health symptoms "preclude gainful employment" and that his "prognosis [was] guarded."  (*Id.* at 975) (emphasis in original).

That same day, Ullman underwent a diagnostic assessment for Marymount Medical Center's Intensive Outpatient Program.  (*Id.* at 1244.)  On examination, LPCC Supan found Ullman's suicide risk moderate.  (*Id.*)  Ullman reported his sleep was getting better, his appetite was stable, he had loss of interest, poor concentration, and poor energy, he had low self-esteem, he was tearful, he sometimes heard arguing in his head, and had symptoms of PTSD including flashbacks, hypervigilance, reliving past events, and being easily startled.  (*Id.* at 1245.)  On examination, Supan found Ullman tearful and melancholic, with soft, slow speech, a depressed mood, a restricted and tearful affect, auditory

hallucinations, fair insight, and fair judgment.  (*Id.* at 1248.)  Ullman demonstrated intact and linear associations.  (*Id.*)

As part of this IOP, Ullman was scheduled to attend group therapy sessions four days a week for six weeks.  (*Id.* at 1744.)

On August 9, 2018, Ullman reported feeling discouraged, having a nightmare the night before, and hallucinating when he woke up.  (*Id.* at 1338.)  Jaklyn Severance, LPCC-S, determined Ullman's interval progress was deteriorating and his overall progress was limited.  (*Id.*)  On examination, Severance found Ullman well-groomed, with a guarded attitude, flat affect, depressed and irritable mood, preoccupied thought process, quiet speech, and intermittent eye contact.  (*Id.*)  Severance noted Ullman was quiet and withdrawn for most of the first group session and wanted to leave early so he talked to a nurse.  (*Id.* at 1339.)  During that conversation, Ullman reported "he was feeling overwhelmed by the noise level and stimulation of the group."  (*Id.* at 1340.)  The nurse led him through a mindfulness practice, after which Ullman reported feeling better and returned to his group session.  (*Id.*)

On August 15, 2018, Ullman reported having suicidal thoughts but said they were fleeting and were not sticking around.  (*Id.* at 1347.)  He told the group he had went to a store with a friend the day before to walk and felt overwhelmed.  (*Id.*)  Severance noted Ullman's interval progress was the same and his overall progress was limited.  (*Id.*)  On examination, Severance found Ullman well-groomed with a guarded attitude, flat affect, depressed mood, logical thought process, normal speech, and good eye contact.  (*Id.*)  Severance noted Ullman "struggled to engage and concentrate" and was unable to complete a worksheet.  (*Id.* at 1348.)

That same day, Ullman saw Shila Mathew, M.D., as an emergency after IOP staff were concerned about his behavior in the group.  (*Id.* at 1350.)  Ullman reported "dissociative episodes" where everything felt unreal.  (*Id.*)  Ullman began having the feeling the morning before group and then it continued while

14

he was in his group session. (*Id.*) Ullman reported feeling hypervigilant and that he was being watched and followed. (*Id.*) Ullman also described feeling like he was watching himself on TV. (*Id.*) Ullman said he experienced auditory hallucinations even when not experiencing dissociative episodes. (*Id.*) Ullman told Dr. Mathew he had not been sleeping well, having gotten only three hours of sleep the night before, and had not been taking his prescribed Trazodone. (*Id.*) While Ullman denied active suicidal thoughts, he reported mild suicidal thoughts "all the time." (*Id.*) Dr. Mathew offered to hospitalize him, but Ullman felt he could manage at home and contracted for his safety. (*Id.*) Dr. Mathew found Ullman's interval progress slightly improved. (*Id.* at 1351.) On examination, Ullman demonstrated clear and distinct speech, normal language, intact associations, a logical, coherent, and rational thought process, and an appropriate and adequate fund of knowledge. (*Id.* at 1352.) Dr. Mathew determined Ullman was oriented times four, his memory was intact, he had normal concentration, his mood was sad and anxious, and he had a restricted affect. (*Id.*) Dr. Mathew increased Ullman's perphenazine. (*Id.*)

On August 22, 2018, Ullman reported he had been sleeping a lot and was struggling with his energy and depressed mood. (*Id.* at 1765.) Ullman also described daily suicidal thoughts, although they had "less power to them." (*Id.*) LPCC-S Severance found Ullman's interval progress was the same and his overall progress was limited. (*Id.*) On examination, Severance found Ullman well-groomed and cooperative, with a flat affect, anxious and depressed mood, logical thought process, normal speech, and intermittent eye contact. (*Id.*)

On September 4, 2018, Ullman reported having suicidal thoughts with no plan over the weekend and feeling discouraged. (*Id.* at 1784.) Kellie Pavlish, LPCC, noted Ullman's interval progress was the same and described him as "attentive and involved." (*Id.*) On examination, Pavlish found Ullman well-groomed and cooperative, with a depressed affect, depressed and pleasant mood, logical thought process, quiet speech, and good eye contact. (*Id.*) Pavlish noted Ullman had periods where he was smiling. (*Id.*)

15

That same day, Ullman saw Dr. Lorenzo.  (*Id.* at 1787.)  Ullman reported improving since starting IOP and rated his depression as a 5/10.  (*Id.*)  Ullman told Dr. Lorenzo he had not been sleeping well, but he had not been taking his trazodone every night.  (*Id.*)  Dr. Lorenzo encouraged Ullman to take the trazodone at bedtime.  (*Id.*)  Ullman reported a good appetite and denied any hallucinations, suicidal thoughts, and homicidal thoughts.  (*Id.*)  Dr. Lorenzo rated Ullman's interval progress as slightly improved.  (*Id.* at 1788.)  On examination, Dr. Lorenzo found Ullman had clear and distinct speech, normal language, intact associations, a logical, coherent, and rational thought process, and an appropriate and adequate fund of knowledge.  (*Id.*)  Dr. Lorenzo determined Ullman was oriented times four, had an intact memory and normal concentration, and had a good mood and restricted affect.  (*Id.*)

On September 5, 2018, Ullman reported feeling hopeful and that he had emptied several boxes and had been walking around his apartment complex more.  (*Id.* at 1792.)  LPCC-S Severance rated Ullman's interval progress as improving and described him as "attentive and involved."  (*Id.*)  On examination, Severance found Ullman well-groomed and cooperative, with an appropriate affect, a depressed and pleasant mood, logical thought process, normal speech, and good eye contact.  (*Id.*)

On September 10, 2018, Ullman reported having a rough weekend and complained that he had not slept well.  (*Id.* at 1800.)  LPCC-S Severance noted Ullman's interval progress was improving, although his overall progress was limited.  (*Id.*)  On examination, Severance found Ullman well-groomed and cooperative, with a euthymic affect, anxious, depressed, and pleasant mood, logical thought process, normal speech, and good eye contact.  (*Id.*)

On September 12, 2018, Ullman reported feeling discouraged and disappointed, and that he had slept all day yesterday and then felt depressed.  (*Id.* at 1807.)  LPCC-S Severance noted Ullman's interval progress was deteriorating and his overall progress was limited.  (*Id.*)  On examination, Severance found

Ullman well-groomed and cooperative, with a flat affect, depressed mood, preoccupied thought process, quiet speech, and intermittent eye contact.  (*Id.*)

On September 13, 2018, Ullman reported feeling enthusiastic and planned to spend the weekend getting rid of some boxes, redoing his budget, spending time with his son, watching the Browns game, going to church, and spending time with his mom.  (*Id.* at 1811.)  LPCC-S Severance rated Ullman's interval progress as improving and described him as "attentive and involved."  (*Id.*)  On examination, Severance found Ullman well-groomed and cooperative, with an appropriate affect, an anxious, depressed, and pleasant mood, logical thought process, normal speech, and good eye contact.  (*Id.*)

On September 17, 2018, Severance completed a Treatment Plan Review Outline.  (*Id.* at 1817-18.) Severance noted:

> Client has been attending IOP for 6 weeks and has missed some sessions due to sleep issues and not feeling well.  He is quiet and attentive in group, uses humor at times, and displays flat/depressed affect.  Client displays some motivation, has been building insight, and displays fair judgment and impulse control.  Client has reported less suicidal thoughts and has been able to use skills to reduce depressive symptoms.  He often reaches out to support when feeling down.

(*Id.* at 1817.)

On September 20, 2018, LPCC-S Severance completed Ullman's IOP closing summary.  (*Id.* at 1828-30.)  Severance noted Ullman had successfully completed his treatment and was transitioning to outpatient care.  (*Id.* at 1830.)  At the time of discharge, Severance opined as follows regarding Ullman's unresolved problems:

> Client continues to struggle with anxiety, panic, and feelings of loneliness.  He has reported having nightmares and flashbacks and will need ongoing support to help him manage these and apply coping skills effectively.  Client also reports struggling with sleep, regulating sleep patterns, and building structure in his daily life.

(*Id.* at 1828-29.)  However, Ullman had reported less suicidal thinking and had "consistently used [his] safety plan."  (*Id.*)

On October 10, 2018, Dr. Faust wrote another letter in support of Ullman's application for disability benefits.  (*Id.* at 1750-51.)  Ullman's diagnoses included recurrent and severe major depressive disorder and alcohol dependence in early remission.  (*Id.* at 1751.)  Dr. Faust opined:

> Mr. Ullman presents to me as a very motivated and insightful individual who is severely compromised at this time.  I do believe that he is currently heavily compromised on attention, concentration, memory processes, and ability to persist especially in any occupation which requires social interaction, adaptation, and a regular employment schedule given dramatic loss of frustration tolerance, increased anxiety and agitation, and sleep disruption documented above.  It is my professional opinion that he is not capable of gainful employment at this time and I'm hopeful that with continued medication adjustment and treatment contingent [sic] continued sobriety, that he will return to some semblance of previous functioning.

(*Id.* at 1750.)

## C.    State Agency Reports

On January 18, 2017, Juliette Savitscus, Ph.D., opined Ullman had a mild limitation in his ability to understand, remember, or apply information, moderate limitation in his ability to interact with others, moderate limitation in his ability to concentrate, persist, or maintain pace, and moderate limitation in his ability to adapt or manage himself.  (Tr. 181.)  Dr. Savitscus further opined that Ullman's "[p]sychological sx may occasionally limit productivity and concentration in the workplace.  Therefore, workplace should consist of 1-3 step tasks and not have high pace or production requirements."  (*Id.* at 183.)  In addition, Dr. Savitscus determined Ullman had a "poor" distress tolerance, "and a high level of interaction with others will exacerbate symptoms of mental health dx."  (*Id.* at 184.)  However, Dr. Savitscus opined Ullman "[r]etains the ability to work in a setting with limited, superficial interaction with others."  (*Id.*)  Dr. Savitscus further opined that while the nature and severity of Ullman's diagnoses resulted in impaired stress tolerance, Ullman retained "the ability to work in an environment that has infrequent changes that can be explained."  (*Id.*)

On July 13, 2017, Paul Tangeman, Ph.D., affirmed Dr. Savitscus' findings.  (*Id.* at 196, 200-01.)

18

**D.**     **Hearing Testimony**

During the October 16, 2018 hearing, Ullman testified to the following:

- Ullman left his last job because he had trouble with his boss, and he was unable to perform like he used to; the company was unhappy with his work because he was unable to concentrate like he had before.  (Tr. 142.)  Ullman did not believe his substance abuse affected his job performance because the only time he would drink or use drugs was when he was suicidal and felt like "giving up."  (*Id.* at 143.)  His substance abuse was not all the time, but it was severe when it occurred.  (*Id.*)  Ullman believed his depression and other mental health issues "extremely" interfered with his ability to do his work.  (*Id.*)  His mental health problems began about three years before he left the company.  (*Id.*)

- After leaving his last job, Ullman sought residential substance abuse treatment at Glenbeigh for thirty to forty days.  (*Id.* at 145.)  After Glenbeigh, Ullman went to a residential program at Matt Talbot for sixty days.  (*Id.* at 146.)  He then completed an Intensive Outpatient Program through Glenbeigh.  (*Id.*)

- From March 2017 to November 2017, Ullman refrained from using drugs and alcohol.  (*Id.* at 147-48.)  He relapsed in November 2017.  (*Id.* at 148.)  Ullman testified his depression and suicidal thoughts preceded his drug and alcohol abuse in November 2017.  (*Id.*)  Ullman checked himself into the hospital after his brother took him to the emergency room.  (*Id.* at 149.)  Hospital staff would not let Ullman leave the emergency room and sent him to a mental health facility for a week.  (*Id.* at 149-50.)  He went back to Glenbeigh for inpatient treatment after that.  (*Id.* at 150.)

- In 2018, Ullman saw psychologist Dr. Faust "almost every other week," except for the month to six weeks Dr. Faust took a leave of absence.  (*Id.* at 151.)  Ullman saw psychiatrist Dr. Streem approximately once a month.  (*Id.* at 152.)  In June, Ullman began another IOP through Marymount Hospital strictly for mood disorders, but he was unable to complete it the first time because he was hospitalized for his mental health symptoms.  (*Id.* at 152-53.)  He restarted the Marymount Hospital IOP in July after being discharged from the hospital and was able to complete it the second time.  (*Id.* at 153.)  Ullman was currently participating in the IOP's After Care program, which met once a week.  (*Id.*)  Ullman was unable to treat with Drs. Faust and Streem while participating in the IOP because of insurance limitations.  (*Id.* at 153-54.)

- He lives by himself in a one-bedroom apartment.  (*Id.* at 154.)  His mom helps him sometimes with cooking, cleaning, and laundry.  (*Id.*)  She also helps him shop for groceries sometimes because he has a hard time being at the store; he loses focus and being around people in public makes him uncomfortable.  (*Id.* at 155.)  He does not get up, bathe, and get dressed every day.  (*Id.*)  He only does those things a few times a week, like going to Matt Talbot meetings once a week and church on Sundays.  (*Id.*)  He also goes to AA meetings at least three times a week.  (*Id.* at 156.)  He either gets a ride or walks to the ones that are a couple of blocks from his apartment.  (*Id.* at 156-57.)

- He has a driver's license but only drives short distances because he loses focus and gets uncomfortable when in traffic. (*Id.* at 157.)

- He cannot fall asleep unless he takes medication. (*Id.*) Once asleep, he will stay asleep, but he has nightmares every night even with the medication. (*Id.* at 157-58.) Sometimes he feels like he does not belong where he is, and things do not feel real; he feels like he is watching it happen on a TV screen. (*Id.* at 159.) His anxiety is very high. (*Id.*)

- In addition to perphenazine, he took trazodone, Prozac, and Wellbutrin. (*Id.* at 158.) He noticed a difference in his concentration while taking Wellbutrin; he can read a little better. (*Id.*) Although he still struggles to focus and comprehend while reading, he has noticed an improvement. (*Id.* at 159.)

The VE testified Ullman had past work as a computer systems hardware analyst. (*Id.* at 168.) The ALJ then posed the following hypothetical question:

> For this hypothetical can you please assume that the individual's limited to work at the sedentary exertional level. This individual could frequently handle and finger bilaterally. That individual could occasionally climb ramps and stairs, but no ladders, ropes, or scaffolds. And this individual - - excuse me. This example can frequently balance, and can occasionally stoop, kneel, or crouch, and cannot crawl.
>
> That person must avoid working at unprotected heights. And  this  individual  is limited to work that consists of one to three step tasks that do not have high pace or production requirements.     Would that individual be able to perform any of Mr. Ullman's past work or any other work in the national economy?

(*Id.* at 170.)

The VE testified the hypothetical individual would not be able to perform Ullman's past work as a computer systems hardware analyst. (*Id.*) The VE further testified the hypothetical individual would also be able to perform other representative jobs in the economy, such as document preparer, final assembler, and circuit board inspector/cleaner. (*Id.*)

The ALJ asked the VE what the tolerance would be for off-task behavior, to which the VE responded 15%. (*Id.* at 171.) The ALJ also asked the VE whether a limitation to superficial interaction with others would change the VE's response to the first hypothetical, which the VE testified it would not. (*Id.*)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4). *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists

in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Ullman was insured on his alleged disability onset date, November 16, 2016, and remained insured through December 31, 2021, his date last insured ("DLI").  (Tr. 46-47.)  Therefore, in order to be entitled to POD and DIB, Ullman must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2.  The claimant has not engaged in substantial gainful activity since November 16, 2016, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3.  The claimant has the following severe impairments: bilateral knee and hand arthritis; class 1, obesity; major depressive disorder; anxiety disorder; post-traumatic stress disorder; and polysubstance use disorder—alcohol, cannabis, and cocaine (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d)).

5.  After careful consideration of the entire record, the undersigned finds that, based on all of the impairments, including polysubstance use disorder, the claimant has the residual functional capacity to perform light work, as defined in 20 CFR 404.1567(b), except he is limited to: frequently handle and finger bilaterally; occasionally climb ramps and stairs but never ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, and crouch; never crawl; no work at unprotected heights; work that consists of 1 to 3 step tasks with no high pace or production requirements; superficial interaction with others; and being off task 20 percent of the workday.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on July **, 1970 and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to a finding of disability because the residual functional capacity limits the claimant to unskilled work (20 CFR 404.1568).

10.     Considering the claimant's age, education, work experience, and residual functional capacity based on all of the impairments, including polysubstance use disorder, there are no jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11.     If the claimant stopped polysubstance use, the remaining limitations would continue to cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the claimant would continue to have the severe impairments.

12.     If the claimant stopped polysubstance use, he would not have any impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d)).

13.     If the [sic] stopped polysubstance use, the claimant would have the residual functional capacity to perform light work, as defined in 20 CFR 404.1567(b), except he is limited to: frequently handle and finger bilaterally; occasionally climb ramps and stairs but never ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, and crouch; never crawl; and no work at unprotected heights.  The claimant is also limited to work that consists of 1 to 3 step tasks with no high pace or production requirements and only superficial interaction with others.

14.     If the claimant stopped polysubstance use, he would remain unable to perform past relevant work (20 CFR 404.1565).

15.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

16.     If the claimant stopped polysubstance use, considering the claimant's age, education, work experience, and residual functional capacity, there would be a significant number of jobs in the national economy that the claimant could perform (20 CFR 404.1560(c) and 404.1566).

17.　The claimant's polysubstance use is a contributing factor material to the determination of disability because the claimant would not be disabled if the polysubstance use stopped (20 CFR 404.1520(g) and 404.1535).　Because polysubstance use is a contributing factor that is material to the determination of disability, the claimant has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision.

(Tr. 49-59.)

## V.　STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).　Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).　In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).　The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must

24

stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

Ullman asserts the ALJ's no disability determination "is premised on his finding that as long as Mr. Ullman abstains from substance use, he is able to sustain gainful work activity (Tr.56)." (Doc. No. 15 at 13.) Ullman argues this finding lacks the support of substantial evidence. (*Id.*) Ullman further asserts the ALJ's determination that Ullman's inability to work stemmed from his substance use relied on his

findings that, when sober, Ullman could perform "minimal daily activities," implying that Ullman's "mental functioning is only slightly impaired." (*Id.*) Ullman argues this reading of the record is erroneous on two grounds: 1) "it presupposes that performing minimal daily activities is evidence of one's ability to work a full-time job"; and (2) "it 'cherry picks,' misconstrues, and in many cases, misstates evidence." (*Id.*) Ullman also asserts the ALJ erred by overlooking "several key pieces of evidence," including a psychiatric hospitalization and emergency visits during a period of sobriety. (*Id.* at 15-16.)

The Commissioner responds that Ullman "appears, though not explicitly, to challenge the ALJ's Step Three finding" in arguing that the ALJ's determination that Ullman had mild or moderate limitations in functioning as a result of his mental impairments was erroneous. (Doc. No. 17 at 8.) The Commissioner asserts that substantial evidence supports both the ALJ's Step Three finding and the RFC determination. (*Id.* at 6-14.) The Commissioner disputes Ullman's claim that the ALJ cherry-picked the evidence, citing evidence on which the ALJ relied which the Commissioner asserts supports the ALJ's findings. (*Id.* at 9.) The Commissioner further argues, "That the ALJ 'cherry-picked' evidence is further belied by the fact that he explicitly considered other evidence from that same month, on which Plaintiff relies, showing the same results." (*Id.*)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 404.1545(a)(1). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. § 404.1527(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 404.1546(c)), and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96-8p at *7, 1996 WL 374184 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered.  *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*).  However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the

27

portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

The ALJ's RFC analysis in support of his RFC determination if Ullman stopped his polysubstance use consisted of the following:

> The claimant alleges disability due to major depressive disorder, anxiety disorder, post-traumatic stress disorder, and arthritis in the knee and right thumb. At hearing, the claimant testified that he experiences knee and thumb pain, depressed and anxious mood, mood swings, irritability, distractibility, and suicidal thoughts as a result of his impairments, and he testified that these symptoms limit the ability to engage in daily activities that involve lifting, standing, walking, remembering instructions, getting along with others, maintaining concentration, and managing himself. However, the claimant also testified that he has a history of alcohol and drug abuse, and he testified that his psychological symptoms became more severe when using these substances. Furthermore, the claimant testified that he has received medical treatment, such as prescription medication and psychotherapy, which [sic] some relief of his symptoms.

> If the claimant stopped polysubstance use, the undersigned finds that the claimant's medically determinable impairments would continue to produce musculoskeletal and psychological symptoms that significantly limit the ability to perform basic work activities. As previously discussed, the evidence within the record establishes that the claimant's right thumb and bilateral knee pain as well as obesity support a limitation to the light level of exertion with additional limitations in postural and environmental functioning-no crawling; no climbing ladders, ropes, or scaffolds; and no work around unprotected heights (Ex. 3F/2; 5F/9; 21F/20-21, 26-28, 48-49); these limitations remain unchanged even in the absence of the claimant's polysubstance use (Ex. 21F/21, 30; 27F/113).

> The evidence of record also establishes that the claimant's psychological symptoms, including the effects of polysubstance use, result in a mild to marked degree of limitation in mental functioning, which limits the claimant to unskilled work with superficial interaction with others and remaining on task for only 80 percent of the workday (Ex. 2F/4; 9F/3; 11F/18, 33; 13F/8; 28F/1). However, the allegation that the claimant would continue to experience a disabling degree of

limitation in mental functioning in the absence of polysubstance use is not supported by the claimant's treatment records, which establish no greater than a moderate degree of limitation in the area of concentrating, persisting, and maintaining pace without the contribution of polysubstance use.

The record reveals that polysubstance use was a precipitating factor to the claimant being admitted for psychiatric and detox treatment in July 2016, April 2017, and November 2017 (Ex. 2F/4, 6; llF/18, 33, 36; 13F/8). In particular, inpatient treatment records from April 2017 document auditory hallucinations, decreased concentration, and periodic episodes of derealization/fugue state upon admission (Ex. llF/36, 40, 44). However, these reports document normal thought content without evidence of hallucinations or suicidal thoughts and intact cognition upon following the administration of psychiatric mediation and the cessation of polysubstance use (Ex. llF/48-49). Outpatient treatment reports dated within known periods of sustained sobriety-such as November 2017 to August 2018 (Ex. 2F/4; 1 7F/19; 22F/120, 128)-consistently document stable/normal concentration and logical, coherent, and rational through processes with no evidence of hallucinations with medication compliance (Ex. l7F/38; 22F/121, 129; 24F/37, 56, 83, 96-97, 114, 128; 29F/37). Furthermore, during periods of sobriety, the claimant is able to engage in a level of daily activity, such as performing household chores, volunteering at church, and creating a budget, that is inconsistent with a marked or an extreme degree of limitation in mental functioning (Ex. 21F/20; 24F/78, 87-88, 93, 101; 29F/14, 60, 66-67, 80).

All opinion evidence has been addressed in a previous section of this decision.

In sum, the above residual functional capacity assessment is supported by a complete review of the record, and it contains appropriate functional limitations to account for the claimant's musculoskeletal and psychological symptoms in the absence of polysubstance use.

(Tr. 57-58.)

The Court agrees that with respect to the mental health evidence of record during November 2017 to August 2018, a period where Ullman remained sober, the ALJ improperly highlighted the normal or positive findings in the record and omitted any discussion of the abnormal or negative findings. (*Id.*) In perhaps the most egregious example, the ALJ cited to one page from notes from the July 23, 2018 visit that resulted in Ullman's inpatient admission for suicidal ideation with a plan of jumping off his balcony. (*Id.* at 1305-1307.) The ALJ focused on Dr. Lorenzo's findings that Ullman demonstrated normal concentration and logical, coherent, and rational thought, but ignored the notations that his interval

progress was worse and that he had a depressed mood and restricted affect, located on the same page.  (*Id.* at 1306.)  Moreover, the ALJ ignored the fact that Dr. Lorenzo "pink slipped" Ullman and admitted him to inpatient care.  (*Id.* at 1307.)  Ullman remained in inpatient care until July 30, 2018.  (*Id.* at 1244.)

Likewise, the ALJ cited a page of the treatment notes by Dr. Mathew that Ullman demonstrated normal concentration and logical, coherent, and rational thought, but ignored the notations that he had a sad, anxious mood and restricted affect, located on the same page.  (*Id.* at 1352.)  Nowhere does the ALJ mention the reason Ullman saw Dr. Mathew in the first place was for an emergency visit after IOP staff were concerned about his behavior during group therapy.  (*Id.* at 1350.)  Ullman reported experiencing a dissociative episode where everything felt unreal.  (*Id.*)  He described his experience as watching himself on TV.  (*Id.*)  Ullman also reported being hypervigilant and uncomfortable around people.  (*Id.*)

As discussed *supra*, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability.  *See, e.g., Johnson*, 2016 WL 7208783, at *4 ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").  The ALJ erred by discussing only the record evidence that placed Ullman in a capable light, without acknowledging – let alone discussing or analyzing – the evidence that potentially supports a finding of disability.  Therefore, the Court VACATES the ALJ's decision and REMANDS this case for further proceedings consistent with this opinion.

As this matter is being remanded for further proceedings concerning review and proper articulation of the record evidence, and in the interests of judicial economy, the Court will not address Ullman's remaining assignment of error.

## VII.  CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED AND REMANDED FOR FURTHER CONSIDERATION CONSISTENT WITH THIS OPINION.

**IT IS SO ORDERED.**

Date:  February 2, 2021                    *s/ Jonathan Greenberg*
                                          Jonathan D. Greenberg
                                          United States Magistrate Judge